Good morning, Your Honor. May it please the Court, my name is Dennis Benjamin. Judge Reimer, can you hear me? I can, thank you. Thank you, Your Honor. I have a small part to play in today's arguments, but I think it's an important one. I'm going to talk about the reasonable doubt presumption of innocence instructions. I'm going to do it in five minutes. The jury instruction claim here is not Tiegbart. To begin, the claim is, this case is easily distinguishable from Levitt v. Arave as the District Court found. At the time of the conviction in this case, 1992, the legal landscape compelled a finding that the jury instructions violated Reynolds v. United States, United States v. Shaw, Inouye Winship, and most importantly, Cage v. Louisiana. Now, the difference between this case and Levitt is that Cage had not been decided in 1989 when Mr. Levitt's case became final. But Cage had been decided in 1992 and in 1993 when the Baldwin and the Michelbacher cases became final. Instruction number 17 of the jury instructions told the jury that the presumption of innocence and the burden of proof beyond a reasonable doubt is not intended to aid anyone who is guilty in fact, but is designed to protect the actually innocent. Now, this court in 1956 found a similar instruction to be error in Reynolds. And it was found to be error because the instruction is contrary to the calculated risk that we take that some actually guilty people avoid punishment in order to save some actually innocent people via the presumption of innocence. The jury instruction 17 implies that society is just as anxious to convict the guilty as to protect the innocent, which is simply not the case. Otherwise, we would not have a presumption of innocence at all. The instruction here actually goes further than the Reynolds instruction because it includes both the presumption of innocence and the burden of proof where Reynolds actually only addresses the presumption question. Now, I concede that Reynolds did not hold the instruction was constitutional error. That's because in 1956 the constitutional dimensions of the beyond reasonable doubt requirement were not clear. And Reynolds specifically says that the presumption of innocence is not based on the Constitution but upon ancient concepts annotating the development of the common law. We know that that view is incorrect once Jackson v. Virginia and N. Ray Winship are deciding. Judge Gould, do you have a question? No. Okay. I thought you were getting ready to spring one on me. Cage establishes that jury instructions violate the 14th Amendment if there's a reasonable likelihood that the jury interpreted the instruction to allow a finding of guilty upon a degree of proof below what's required by due process. We are a pre-AEDPA case. 022 and 023 are both pre-AEDPA cases. So we can look to circuit precedent under Bell v. Hill and Belmonte v. Woodford to determine whether the rule was clearly established in 1992 and 1993. So when you read Winship and Reynolds and Cage together, the Idaho Supreme Court would have felt compelled at the time of the direct appeal to find jury instruction number 17 would be reversible constitutional error if within the context of the instructions as a whole there was a reasonable likelihood that the jury interpreted the instructions to allow conviction by proof less than reasonable doubt. And I emphasize that reasonable likelihood. That's not even a preponderance. So it's a fairly low standard that we're looking at. If I could turn to the particular instructions in case 022, the Bingham case, and explain why those other instructions don't cure the error that we find in instruction 17. The record here, unlike Levitt, for example, shows that the state trial prosecutor used instruction number 17 to undermine the presumption of innocence. He argued in closing to the jury as follows. Whether he was innocent or not before this trial started was not a known fact to you. But he was presumed innocent, and that was the presumption. It's like a veil that hangs over him and protects him. He goes on to say it's designed to protect innocent people from being convicted of crimes. It's also geared in such a way, though, innocence, so guilty people don't get away. He goes on to note that Mr. Rhodes is guilty for real, and guilty under the law. So this argument by the state prosecutor sets forth the very reason Reynolds disapproved of the instruction. The prosecutor told the jury that society is just as anxious to convict the guilty as to protect the innocent. Plus the reference to guilty in fact by the prosecutor reminds the jury of number 17's statement that the presumption of innocence in the beyond a reasonable doubt standard is not intended to aid anyone who is in fact guilty to escape. So the prosecutor's argument exacerbates this. Finally, when you look at the other instructions in the case, many of them contain language disapproved of by the Supreme Court. For example, instruction number 16 uses the phrase moral evidence, which was disapproved of as not a mainstay of the normal modern lexicon. It also uses the term moral certainty, which was disapproved of in both Cage and Victor v. Nebraska because it could let a juror understand that there is a lower meaning, a lower standard of proof. Now this case is a little different from Sandoval because the court found in Sandoval that the moral certainty language was not constitutional error because other instructions lent context to the phrase. In this case, there was a specific instruction about what moral certainty meant. The state court did not equate moral certainty to near certainty as the court did in Victor but told the jury that moral certainty is that degree of proof which produces conviction in an unprejudiced mind. So here the court specifically defines the term moral certainty to mean something less than beyond a reasonable doubt. Again, the prosecutor, in rebuttal argument, unlinked the moral certainty language from the abiding conviction language which saved the instruction in Victor. He says, I don't think you have to abuse yourself by going in there and exposing yourself to a lot of debate and discussion. You have sat through this case very attentively almost two weeks. You know how you feel right now. The court told you that he defined reasonable doubt for you. Proof beyond a reasonable doubt is when you feel within yourself to a moral certainty, that you believe a moral certainty of the truthfulness of the charge. Then that's the feeling you have to have. You people recognize those kinds of feelings and I think you can go in there and make your decision and find him guilty of what he's done. So by emphasizing the feelings and not linking moral certainty to evidentiary certainty or near certainty as required by Victor, instruction number 29 in the prosecutor's argument untethered moral certainty from evidentiary certainty. Mr. Benjamin, you can spend as much time as you wish of your total time on this issue, but I just would remind you at the outset you said you were going to take five minutes and about nine minutes have passed. Your Honor, my last comment is the writ should issue because error of this type is structural error under Sullivan v. Louisiana. I'd like to address, Your Honors, three issues. Penalty phase and effective assistance of counsel, Brady, and the right to present a defense. The defense failed to present, so the sentencer did not know in this case, massive amounts of classic mitigation because as trial counsel attests in an affidavit, quote, we just did not think to do it, unquote. To do what? He attests that the only sentencing investigation conducted by his investigator and he was to talk with Paul's, Mr. Rhodes' parents, one or two of his brothers and sisters, he had four, several acquaintances and a former employer. Here's what trial counsel attests he did not do. Quote, neither I nor anyone else working with me on Mr. Rhodes' case took any other steps to learn about his mental health, emotional, social, and drug use background in preparation for the sentencing proceedings. It wasn't that we had any reason to think it a bad idea, that we felt doing so would somehow adversely affect Mr. Rhodes, or that we had information from family members or elsewhere that made us think records requests or other additional investigation would be wasteful. Instead, we just did not think to do it. During the approximately three hours long evidentiary part of Mr. Rhodes' sentencing hearing, defense counsel called 14 witnesses, 10 family members, mom, dad, two sisters, some aunts, some uncles, two friends of Paul and his family, and two jailers. Each witness' testimony averaged 12 minutes. I'm not suggesting there's some formula here. I am suggesting that 12 minutes is an awfully short amount of time to get someone's rich background in front of the sentencer. And indeed, it shows in this case. What came out, and what came out with this level of depth, was that Paul had childhood polio. That left him with a permanent physical disability, including a lack of coordination. It precluded him from participating in many normal childhood activities. That Paul was gentle, caring, and trustworthy. That he was well behaved in county jail. That he was a skilled and dependable sheet rocker. And then the PSI, what came out, which provided scant additional information, was Paul's substance abuse. And that was about the level at which it came out. Paul abused a lot of drugs. We filed a proffer in the court below. The court below denied us an evidentiary hearing on this. And indeed, no court has heard a penalty phase IAC claim in this case before. In Porter V. McCollum, this Court is well aware of Porter V. McCollum. And in light of time, I'm going to move on. The mitigation that Mr. Rhoades' sentencing means nothing about includes, by topic, that Mr. Rhoades was born to and raised in some sense by a mentally retarded and suicidal father who himself had been physically abused and neglected as a child. Mr. Lowy, it would be helpful to me for you just to cut to the chase. Because what the district court basically said was, look, sure, your proffer paints a much fuller picture of his family and its dysfunctionality. But there is nothing in the proffer to show that Rhoades himself was abused or institutionalized or abandoned or mistreated in any kind of serious way, and the experts adduced 20 years later do not fill in any blanks about his mental health. And it seems to me like that's what you need to say isn't correct, and why. Judge, with regard to the first point, which I take it, if I may just make sure that I'm understanding your point, Judge, is that there's nothing in the proffer which suggests that Mr. Rhoades was directly victimized himself. That is, there's stuff in the proffer suggesting, for example, that sisters were sexually abused, that others were sexually abused, but Mr. Rhoades was not personally sexually abused. Well, that's what the district court said. And so what I'm trying to get from you is why the district court's ruling is off base. The reason why the district court's ruling is off base, Judge Romner, is this. Dr. Beaver's declaration, as well as Dr. Stewart's declaration, does speak to that. They both state in their declarations that while one certainly is victimized and one is directly a victim, so too, however, when one observes trauma, one is traumatized by the observation. And, in fact, Dr. Beaver speaks about this in his declaration specifically with regard to children and what trauma, what children observing trauma in a home which is chaotic, which certainly Mr. Rhoades was, does to the development of that child. Dr. Beaver speaks to this. The problem is, as I understand the district court to say, is that this was not brought home to Rhoades. And our suggestion, Judge, is, I guess, twofold. One is, A, this is classic mitigation. We don't need to show that Mr. Rhoades himself was directly victimized. Well, if you haven't, if you don't have to show that, which is probably correct, and if you haven't shown it, then what you're faced with on the prejudice side is very weak additional mitigation beweighed against very strong aggravating circumstances. No, Judge, respectfully, I disagree. Dr. Beaver, for example, speaks about exactly what Paul's awareness of and observing the sexual dysfunction in his immediate and extended family, what effect that would have on Mr. Rhoades. And, indeed, he speaks about how that led to Mr. Rhoades' own issues surrounding, for example, sex. And he speaks to that quite clearly in his proffering, in his declaration. Excuse me. He also speaks to how this particular context, this constellation of facts, this, you know, frankly, wretched environment into which Mr. Rhoades was born led to his drug abuse. I'm sorry, Judge. As I read the Beaver declaration, I understood him to be talking still in theory. That is, did he actually examine Rhoades? Dr. Beaver examined Rhoades in, I believe, 1999. I may be off by a year. It might have been 2000. Okay. As I read it, he talked about why he would be at risk for all these kinds of things because of his family. Well, that's different from a diagnosis that says, yeah, there's a causal link here, and, you know, this guy couldn't tell the difference between right and wrong because of his family situation, or this guy was incapable of, you know, dealing with any kind of reality because of his family situation. Well, I think a couple of answers to that. First, we do, of course, have the diagnosis in Dr. Stewart's declaration of post-traumatic stress disorder with childhood onset. And he does, contrary to opposing counsel, come to that diagnosis to a reasonable degree of medical certainty. And it's truly stated in his affidavit. One. Two. Of course, this Court is aware of Kennard. We need not explain the cause of the crime for which Mr. Rhoades was convicted. What we need do is show, of course, reasons for which a jury or the sentencer, not a jury in this case in Idaho back then, but the sentencing court, may have had to choose life. One need not, to do that, show a causal link between the horrific environment in which someone is raised and the offense. Three, we have made a colorable showing, and we would develop more, of course, at an evidentiary hearing. What? Yes. I'm sorry. What? What would we develop at an evidentiary hearing? Yeah, I mean, I don't see it in the record. So, I mean, is there any place in the record that shows what you would have developed had you had a chance, other than the 1,000-page proffer? Well, we would, of course, be doing more examinations of Mr. Rhoades. We would have him examined by experts, as is indicated in the declarations, to confirm what they quite clearly state, and Dr. B and Dr. Stewart quite clearly states, is highly probable, given the long-term and high-dose use by Mr. Rhoades of a panoply of extremely toxic drugs. Specifically, of course, I'm referring to some sort of brain damage. What is lost in some of this analysis, I think, is that in addition to what sort of the bad that was presented, and with different meanings, perhaps, of bad, with regard to the drug use and what led to the drug use, the horrible criminal history within Mr. Rhoades' family, the multi-generational alcoholism and substance abuse within Mr. Rhoades' family, both the immediate and extended, the suicidality of Mr. Rhoades' family, the criminal history of Mr. Rhoades' family, the whole environment into which Mr. Rhoades was born, despite that, Mr. Rhoades showed some promise. In the affidavits, we have Mr. Rhoades as someone who was at one time a reliable worker, who at one time was a person of his word, and who nevertheless was unable to escape these horrible, horrible tendrils of the horrific environment in which he lived. And did escape, I suppose, in one way, and in a very, very unfortunate way, as we see all too often, and that's through abuse of substances. You know, I sometimes speak about it as self-medication, and I think that's much too sterile a word. It suggests sort of a suburban kid getting valium out of his mom's drug cabinet. That's not what's going on here. This is a sordid, impoverished environment in which this kid was living. And as, in fact, one of the police officers writes in an affidavit, everyone who knew the Rhoades family in Idaho Falls knew that Paul Rhoades stood not a chance. For these reasons, all of these reasons, we ask that this court send this case back so that Mr. Rhoades can, for the first time, have an evidentiary hearing on penalty phase IAC. With regard to the Brady claims, my time is short. With regard to the invocation of silence, I would ask that the court consider what I argued in the last argument. But I'd also note that Mr. Moss, the prosecuting attorney in this case, in his closing argument, in referring to Mr. Rhoades' statements, and in referring to Detective Sean Rodriguez coming up to Mr. Rhoades at the four-way, told the jury he knew what they were there for. If he knew what they were there for, it seems to me extremely unlikely that that invocation in the car, or what I call the invocation in the car, was just for the burglary, or perhaps even at all for the burglary. The court below held that this was newly discovered evidence, the Shaw Report. Now, I want to note that ultimately what the court held was it was out of time. It was affidavits were filed. What happened was the report was filed. Opposing counsel said that the court ruled no evidentiary hearing. We put in affidavits from a review of trial counsel's files, the prosecuting attorney's files, saying that Shaw's report appeared in neither, and got an affidavit from trial counsel saying he'd not seen this before. And opposing counsel argued too late. Your motion to reconsider what was initially filed as a motion to alter an amendment under 59E is too late. We filed a motion to consider it as just a motion to reconsider. The court ultimately ruled too late because you're 10 days, you're under a 10-day time limit under the local rule and under 59E, and you filed that for 10 days. In fact, we did not file that for 10 days. We filed on day nine. Under Rule 6A of the Rules of Civil Procedure, if you're under 11 days, you don't count the weekends. The order came out on a Tuesday. I can't tell you what day it was, but if you count up the time, in fact, our motion to reconsider was filed on day nine. We were not out of time, as the court ruled. If it had been filed on time, those affidavits should have been considered. And with those affidavits, there was a question, at least a fact, as to where that Shaw report was. And there should have been an evidentiary hearing. Mr. Lawley, there's five minutes left, and if you want to do rebuttal. I do appreciate that, Judge. I do appreciate that, and I'm going through that in my head right now. I want to address briefly the preclusion of Mr. Wright's Sixth Amendment right to present a defense. And this goes to, if you can just give me a moment, please. Thank you. This goes to Mr. Buchholz's three confessions to two officers in the space of an evening. Mr. Buchholz was ruled unavailable at trial. He confessed to killing Stacey Baldwin. He was arrested at his parents' house for assaulting his mother. He subsequently that evening confessed to killing Stacey Baldwin. He gave a detailed confession, unlike Mr. Rhodes. And when he was unavailable at trial, defense counsel wanted to call Officer Christian, one of the officers to whom he confessed, to relate that confession, of course, to the jury. The prosecuting attorney got wind of this by the motion in the major preclude. And based on representations from the prosecuting attorney, the trial court precluded Officer Christian's testimony. Those representations consisted of misrepresentations in part, and there were also material omissions. What is the most salient, and I'm going to just speak to that, the most salient misrepresentation? It is this. Quote, everything that counsel has related, Your Honor, was on the news, and everything that counsel had related were the facts of Mr. Buchholz's confessions, was on the news following the death of Stacey Baldwin, and there's nothing that has been recited that Mr. Buchholz wouldn't have learned by one simple news story. That's true to a lot of things. But what it is not true is to Mr. Buchholz saying that he had shot Stacey Baldwin twice in the back. In fact, the news reports relate that Dr. Fantelli, the pathologist, had declined to answer the question as to how many times Stacey Baldwin had been shot. And furthermore, Mr. Moss, the prosecuting attorney, was quoted more than once in the press as saying that Ms. Baldwin had been shot once in the back. The truth is Ms. Baldwin had been shot twice in the back. There were three shots. One had entered her arm and didn't exit, and Dr. Fantelli in his testimony opined that because it did not exit, it was a ricochet shot, and it didn't go into her back in any event. This is, of course, not from the papers, and it would appear that Mr. Buchholz's other information, of course, the other particulars, might not have come from the papers as well. They might have come from Mr. Buchholz's actions. I thought on that particular point that the government's brief argued that he could have heard about the shots in the jail. That is their point. It is, of course, pure speculation. There is no one who they put on in post-conviction suggesting that they had talked about it in the jail. Dr. Fantelli's declining to speak about the number of shots, the misinformation in the press, would suggest that that actually was being held close to the vest for purposes of investigation. Okay, thanks. I'm going to reserve the rest of my time for a very short rebuttal. You've only got a minute. We'll add two minutes to your rebuttal time. I appreciate that, Judge. Thank you. Too many things here. May it please the Court again. As to the jury instructions, of course, the State relies extensively upon Levitt v. Arvey, decided by this Court a number of years ago. And as to this presumption of the innocence instruction and whether it is, in fact, Teague Bark, I understand this Court's, I believe it was Balmonte's, and there's a subsequent case, discussion about whether, for Teague purposes, this Court can rely basically exclusively upon this circuit's precedent. The problem that I have with that ruling in this case is twofold. Number one, Reynolds does not stand for the broad proposition that Rhodes would like. Reynolds was not decided upon constitutional principles. And what I mean by that very specifically is that, or at least principles as they exist now, is that Reynolds was viewed, that instruction in Reynolds was viewed in isolation. And really, this Court has never addressed outside of maybe, arguably, if we stretch it, Shaw, whether that presumption of the innocence instruction, when considered in its entirety, is erroneous constitutionally. The second problem that I have with this argument, or the argument that Teague doesn't apply, is that if you look at what reasonable jurists would have decided or known in 1987, what they would have known is that this circuit in Reynolds said, yeah, you can't use it. At least we've determined that it's erroneous. When it's viewed in isolation. But there was no Supreme Court precedent. There was a split in the circuits, and there was a split in the states. And even after 1987, after Rhodes was tried, there was still another circuit that said, yeah, it's probably not a great instruction, but it's not unconstitutional. There was at least one state that said, yeah, it's not a great instruction, but it's not unconstitutional. And so when we look at what reasonable jurists would have done, considering the fact that, at least it's my understanding, that the United States Supreme Court has said that we don't have to follow circuit law, even though when I say we, meaning Idaho, but we do have to follow Supreme Court precedent. When you look at all of those splits, I just don't see how this instruction can't be Teague-Bart. I don't think my reading of Levitt, and, of course, I realize that Judge Reimer was on that panel and so will know more than I. But my reading of Levitt is that that instruction wasn't based exclusively upon the fact that Teague had not been decided. I read Levitt as being much, much, well, not much, much, but at least broader than that. But assuming for the sake of argument that it is not Teague-Bart, when you look at all of the other instructions that were given, there was no problem. That's what happened in Shaw, is that the court looked at the other instructions that were given and said, there's no error here. That's what this court should do here. This case and the instructions that were given are virtually indistinguishable. In fact, I can't find any way that they are distinguishable from the instructions that were given in Levitt. And, again, I recognize that the court decided that the case in Levitt on Teague. But as I read between the lines, and certainly as the district court read between the lines in Levitt, those other instructions clearly salvaged any alleged error that was associated with the presumption of innocence instruction. As to instruction 16, the reasonable doubt instruction, that very instruction, or at least the moral evidence and moral certainty language, is identical to what was upheld in Victor. And I know the Supreme Court said, yeah, that's not great language, but it was upheld. And certainly this court recognized that in Levitt and found that there was no error based upon that instruction. And as far as structural error, I'm not aware of the United States Supreme Court, or for that matter any court, finding that a presumption of the innocence instruction is structural error. Certainly instructions on beyond a reasonable doubt are, but not a presumption of innocence. I want to spend a few minutes on the mitigation question. I am troubled because it's the state's position that this claim has been expanded far, far beyond what was raised in the amended petition. The entirety of the claim as raised in, I believe it was the third amended petition, is this. Failing to investigate, develop, and present mental state issues at trial and his mitigation at sentencing. There is no claim in that claim regarding all of the other stuff regarding his family upbringing. The claim is mental health, and exclusively mental health. And if you look at the claim in its entirety right there, the fact, its conclusory nature alone should warrant affirming the district court. There's no explanation as to what was not investigated, what was not developed. There's simply nothing in that claim. And on the eve of filing our supplemental merits briefs, we get, we being the state, get a 10-inch stack of materials with really no discussion, a three, four-page proffer, a little bit of discussion in the expert's reports. But basically the district court is forced to somehow cobble and sew together this stack of material and determine whether there's a mental health issue. And there simply wasn't. In addition to that, I think we have to look at the issue, particularly of what is in Beavers and Stewart's report. Counsel specifically contended that there was a diagnosis of post-traumatic stress disorder. Now, that's a pretty significant diagnosis. There's a recent case from the United States Supreme Court talking about PTSD. The problem that I have with that is that Dr. Stewart said that his diagnosis was not, and he could not base his diagnosis on the DSM. That's the Bible as far as mental health providers. I don't know where he digs that diagnosis from. He concedes that at the bottom portion of his declaration, that he can't at this point in time meet the standards for that diagnosis under the DSM. So how in the world can he arrive at that? He doesn't tell us. He just says, yeah, I believe it. I would submit that that's simply not good enough to even warrant an evidentiary hearing. Dr. Stewart has never examined Paul Ezra Rhodes. I'm sorry, Dr. Stewart has not examined? Has not examined Paul Ezra Rhodes. That's in his declaration. He relied upon Dr. Beaver's report, who Dr. Beaver indicated he conducted only preliminary psychological testing. So Beaver's did meet with Rhodes? Yes, he did, Your Honor. Stewart's declaration explained it was, quote,  He says Rhodes may have been born with some mental deficiencies. May. And his family history places him at severe risk. Again, there is nothing tying Paul Ezra Rhodes into any of this theoretical, the theoretical underpinnings of Dr. Stewart's report and declaration. There simply is nothing there to warrant an evidentiary hearing. We don't know what mental deficiencies, what mental health conditions. As far as Dr. Beaver's report, he stated that Paul Ezra Rhodes was genetically loaded for substance abuse and use of methamphetamine may have damaged his brain, but doesn't state that it did. And the trial court in this case knew of Rhodes' drug use and knew that it was pretty darn extensive. It was discussed both in the PSI that the probation and parole provided. It was discussed in Rhodes' PSI, and several of Rhodes' family members discussed his extensive drug use, including methamphetamine and cocaine. The bottom line on this is that even 22 years after, let's see, 1987 was the murder, more than 22 years after Rhodes committed this murder, after he was sentenced, we still don't know definitively. Not even definitively. We have supposition. We have theory. What Paul Ezra Rhodes' emotional and mental makeup is, it's inconclusive. And yes, I have not a scintilla of doubt that if granted an evidentiary hearing, that counsel would be able to go out and find some additional experts that would come in and testify as to whatever they would testify about. I have not a doubt about that. But counsel in 1987 was not required to shop for experts that could be bought or found in 2010. They had an expert. It was Dr. Ash. They consulted with him, both in the Baldwin and the Michelbacher trials. And as I recall, Mr. Parmenter's testimony, he said that another expert was not retained because they felt they had pretty good handle on Rhodes' mental circumstances. And keep in mind that certainly while most attorneys aren't mental health experts, Mr. Parmenter testified that he had some experience working with people that had mental illnesses at State Hospital South. We just, again, the time has passed to make proffers and to submit evidence. If we can't get it done prior to oral argument before this court, then it certainly doesn't exist or is going to certainly be suspect. The time has passed for the presentation of additional mental health or for that matter any other type of mitigation in this case. As to assuming that this claim can actually incorporate the other family members and what happened to them, I understand that Dr. Beamer and Dr. Stewart says that growing up in that type of thing, seeing those types of things can be not a good thing for a kid. I wouldn't want to live in that. I wouldn't want to grow up with that. But when we look at the aggravation in this case, simply growing up in a bad environment, a miserable environment even, wasn't going to change the equation in this case. By the time we got to the Baldwin case, the Baldwin sentencing, let me rephrase that, Paul Rhodes had already been sentenced to death in the Nickelbacker case. He'd already pled guilty in the Haddon case. This is a man that was convicted of three murders, one capital murder. That was what the district court in this case focused upon. That's what was critical to this court. I think that the Supreme Court's recent decision of Wong versus Belmonte's where they state that the type of more evidence is better approach advocated by Belmonte's and the court of appeals might seem appealing. After all, what is there to lose? But then the court went on to focus on the fact that more isn't always better, that really what you want to focus on is quality. And the vast majority of that which was presented in the proffer was either inconclusive or was already presented to the district judge. There was simply no basis for reversing this death sentence based upon the mitigation investigation and there is certainly no basis for granting an evidentiary hearing. As to Drenke, counsel mentioned that in his argument. I understand that there doesn't have to be a causal connection between the mitigation and the murder that occurred. That doesn't mean that if the mitigation doesn't have some kind of causal connection that you can't give it the proportionate weight. And what I mean very specifically by that is if one could come in, for example, mental retardation and establish that someone was mentally retarded, and I know we can't execute those that are mentally retarded now, but that would have a causal connection as to perhaps the circumstances surrounding a murder, the intent, etc. That would have significant weight. And the Supreme Court has concluded so much weight that we can't execute those individuals. As opposed to something entirely unrelated to the murder. Yes, it has to be considered under Drenke. That doesn't mean that it has to be given any kind of significant weight. And that's what I would submit should be considered with these additional affidavits and proffers from family members and friends. As to the Brady claims, very quickly. Just a moment. I have a question on the Brady claims. Were these claims asserted in the district court as Brady claims? My recollection, Your Honor, is that there were three Brady claims. There was Shaw's report, and actually that should be clarified as to one report. They alleged that that was a Brady claim. And I'm talking this case, the Baldwin case. The reports from officers Love and Christian regarding Buckholtz's confession. And then I believe there was a third, and that's Loretta Wallace's videotaped statements. My recollection of the petition was that those three things were alleged. In the Michelbacher case, they weren't. But in this case, my recollection is that they were. As to Shaw's report, Rhodes' attorney testified regarding whether he saw the report, and he said, I believe I did. I'm familiar with some of the information that was in it anyway. He went on and said, I believe I would have, meaning had the report. When asked if there was something in it, he says there's a lot of information. A lot of the information is information that we had at the time. Again, I don't have a specific report, but I guess that's the best answer I've got. Yes, they filed a subsequent affidavit, which the district court said they wouldn't even consider. But let's assume, for the sake of argument, that that additional affidavit is considered. Parmenter never recanted his testimony that he was aware of the information in the report  Now, whether he had that specific page, we can debate. But he was aware of the information in the report. And that's the page where Shaw talks about the statement that Rhodes made when he was in handcuffs. I would submit that he actually had that. But at best, all that affidavit tells us is that he may not have had that page, but it doesn't tell us he didn't have the information. And if he had the information, it's not a Brady violation. That's fundamental Brady law. Even in his reply brief, Rhodes does not refute Parmenter's concession that he knew of the information. The only thing they argue is that he didn't have the page of the report. That's all. Additionally, as I said in the prior argument, Rhodes was present when he made this statement. They knew of the information even without Shaw's report. And finally, there's no showing of materiality as to that report. The only way that this claim has any viability whatsoever is if this court concludes that the second I did it statement was unconstitutional. And we would submit that that finding cannot be made. And even if the statement was unconstitutionally admitted, look at the plethora of other evidence that was admitted. This case was based upon a foundation of ballistics testing, unrefuted ballistics testing, forensic evidence, hair, shoe prints. And then, of course, there was Rhodes' confession to Mr. Holmes, who was his cellmate. We didn't need the I did it statement. And quite frankly, if I had been the prosecutor, I wouldn't have even tried to admit it just because you didn't need it. You have so much other evidence. And in my estimation, Your Honors, quite frankly, without a videotape of the murder itself, I've not seen a case with more evidence establishing Rhodes' guilt. It's not a circumstantial case entirely. Yeah, there's a lot of circumstantial evidence, certainly the forensics, et cetera. But Rhodes' statement to Holmes established. And keep in mind that that confession to Holmes is not challenged on appeal. As to Buckholtz's testimony, it just didn't matter. You know, if that statement would have come in, there's just no conceivable way that it would have made a difference. Buckholtz was just plastered the night that he made those statements. Apparently, the only thing out of all his statements that counsel says was not known in the news reports is that Stacy was shot twice in the back. I don't recall all the news reports being in the record. But let's assume that, you know, that's true. He could have guessed.  What we do know is that, as I said, he was drunk. He recanted that confession. And he had an alibi. And I realize that it's a family alibi. Most people are with their family when they're gone out doing other things. But more importantly, Detective Jackson testified at the evidentiary hearing that he had concerns about Buckholtz's statements regarding the truck. It didn't fit. Confirmed that the pickup was widely known and never connected to Stacy's murder. Significantly, Buckholtz's feet were smaller than the footprints at the murder scene. Didn't fit the forensic evidence. His hair didn't match. They tested it. And he had absolutely no connection to the murder weapon. The only person with any connection to the murder weapon was Paul Rhoades. Counsel, I have a question for you on that. Yes. My understanding was that at some point there was a request for an evidentiary hearing involving a statement of a confidential informant to effect that Buckholtz had been trying to sell a gun. I have a vague recollection of that, Judge Gould, but not a clear recollection because I don't think it's been an issue that we've discussed in the briefing. I don't believe, though, that I believe, boy, I wish I could remember, Your Honor, and I apologize, I don't. I don't remember if it was a CI. I do remember that there was some individual that saw Buckholtz with a gun, but I don't recall any proffer at the trial court level, even during the post-conviction hearing that established, in fact, that there was a connection. And that's really important in this case in that Rhoades has had an evidentiary hearing on this issue. This issue was extensively litigated during post-conviction. Rhoades called witnesses. The State called witnesses. And as a result of that testimony, in fact, the trial court, who was the same judge that heard the trial, made the pretrial rulings and imposed the death sentence, concluded that he was wrong in stating during the trial that Buckholtz was unavailable and actually concluded that he was available. So under Idaho's rules of evidence, not only was the statement uncorroborated under Idaho's rule of evidence, but he was available because what they offered was not Buckholtz, but they offered Christian and tried to get it in under a hearsay exception. Unless there are any questions by the court, I believe that's all I have, and would ask the court to affirm the district court below. Okay, Judge Bivey, any questions? No, thank you. I have none. Thank you. Okay, Kathy, could you add two minutes so we are giving three minutes to Mr. Loy? Okay. If I can address mitigation first, please. Opposing counsel noted that it seems to repeat an allegation he made in his briefing that we just threw 1,000 pages at the district court and told them to figure out how it went together. Actually, we provided to the district court. We provided to the district court an index which contained four columns describing the exhibits in column one, the exhibit number in column two, the docket number in column three for Bingham, and the docket in column four for Bonneville. So it's just not true that we threw at the district court 1,000 pages and expected the district court to somehow figure out what it was. In addition to which, as I'm sure the court knows from having read the declarations, the declarations are heavily footnoted to those exhibits. It's not that we just threw 1,000 pages at the court expecting to somehow work magic with 1,000 pages or asking the court to work magic. They went hand-in-glove with the declarations. How can Stewart arrive at a diagnosis because he didn't use the DSM or did not comply with all the requirements of the DSM? Excellent cross-examination question at an evidentiary hearing, perhaps. But Dr. Stewart says in his declaration that he has, that it is my clinical opinion held to a reasonable degree of medical certainty that Mr. Rhodes does suffer from this condition, the condition, of course, being PTSD with childhood onset. I should note also that this is a pre-emptive case. The trial court knew, according to opposing counsel, Mr. Rhodes' extensive drug use. Well, it knew that Mr. Rhodes used drugs. It certainly had no clue of the extents of Mr. Rhodes' drugs, either the extent in terms of the dosage, the fact that he was cycling, and the full panoply of drugs. But that's not the point. The point really is that, well, that's not the full point. The fuller point is what led Mr. Rhodes to be abusing those drugs in the first place. And that's why that whole social history is important. By the way, the State apparently concedes that we wouldn't have experts talking to the lower court if we had an evidentiary hearing about brain damage. The court, or excuse me, Mr. Parmenter had a pretty good handle on Mr. Rhodes' mental health. Well, how could he? He had none of the supporting documents. He had done none of the investigation. It's, at this point, absolutely clear from Porter v. McCollum, from Wiggins, and from Strickland, that you need to do an adequate amount, a reasonable amount of investigation, before you decide to stop investigation. And here we have an affidavit where he did no investigation, beyond the minimal amount which I noted in the opening argument. Your extended time. I am out of time. Now cycling up. I'm out of time. If you could bring it to a conclusion. Thank you. Rompia. Rompia speaks about a situation very similar to this case, where there was evidence put on. There was some evidence put on. But ultimately what the Supreme Court held is that the evidence put on at the evidentiary hearing in district court, in federal district court, was presented simply a different universe than what had been put on at sentencing. So the fact that some evidence, for example, of drug use was put on, really isn't the point. And with that, I thank you, Judge. Thank you very much, Mr. Loy. This case number 0799022 shall be submitted. The court will now take a recess.
judges: Rymer, Gould, Bybee